IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


OATEN V. CRETE CARRIER CORP.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


MICHAEL L. OATEN, APPELLEE,

V.

CRETE CARRIER CORPORATION, APPELLANT.


Filed April 7, 2020.   No. A-19-617.


Appeal from the Workers' Compensation Court: J. MICHAEL FITZGERALD, Judge. Affirmed.

Paul T. Barta and Jenna M. Christensen, of Baylor Evnen, L.L.P., for appellant.

Jamie Gaylene Scholz, of Miner Scholz & Associates, P.C., L.L.O., for appellee.


PIRTLE, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Crete Carrier Corporation (Crete Carrier) appeals from the Nebraska Workers' Compensation Court's award of benefits to Michael L. Oaten based on an injury he suffered on March 7, 2015, while working for Crete Carrier as a truck driver. The compensation court determined that Oaten was permanently totally disabled and directed Crete Carrier to pay him benefits accordingly. For the reasons that follow, we affirm the compensation court's findings and award of benefits to Oaten.

## BACKGROUND

On March 24, 2016, Oaten filed a petition against Crete Carrier alleging that he suffered a right distal fibula ankle fracture on March 7, 2015, when he stepped out of his truck and slipped and fell on ice. He sought recovery for the costs of medical treatment, temporary total disability,

- 1 -

temporary partial disability, permanent partial disability, vocational rehabilitation, and attorney fees. On April 13, 2016, Crete Carrier filed an answer and counterclaim, which admitted that Oaten was its employee on March 7, 2015, but denied all other allegations. Crete Carrier alleged that any disability Oaten suffered resulted not from a workplace injury but a sickness, infection and disease, or an inherent and preexisting condition. On September 15, 2016, the parties filed a joint stipulation for dismissal without prejudice, which the compensation court granted on September 19, 2016.

On November 30, 2017, Oaten filed a second petition against Crete Carrier, which recited the same allegations of his first petition. The second petition also added an allegation that Crete Carrier had made payments of medical and indemnity benefits on Oaten's behalf during the last two years. On December 15, 2017, Crete Carrier filed an answer denying Oaten's allegations.

Trial was held on August 27, 2018, at which time Oaten testified, and 80 exhibits were admitted into evidence. Crete Carrier agreed that Oaten had fractured his ankle while on the job. Additionally, the parties agreed that Oaten's average weekly wage was $956 and that Crete Carrier had paid benefits to Oaten at a weekly rate of $584.74 from March 7, 2015, through April 28, 2017.

Oaten testified that he is a high school graduate and began working for Crete Carrier as a truck driver in January 2014. No physical limitations were placed on him as a result of the pre-employment physical examination. As a truck driver for Crete Carrier, Oaten said that he occasionally had to get out of his truck and open the doors at a loading dock, but he said that he never drove flatbeds that required him to tarp and un-tarp a load. Oaten described that he had to "climb up" into his truck by stepping on the footing and taking ahold of handrails, the armrest, and the steering wheel. He said that every day in the morning, he completed a safety check of his truck, which required him to walk around it and "stoop down, bend down" to check the tires. He also said that he had to "get[] up underneath the truck, make sure all of the tires are up for safety . . . and the lug nuts are tight." Oaten's safety check also required him to check the oil, which required him to lift the hood that weighed an estimated 2,000 pounds and was supported by hydraulics.

Oaten also testified regarding his physical condition prior to the workplace injury he suffered on March 7, 2015. He had a total knee replacement of his left knee on January 31, 2013. On July 10, 2013, Oaten sought treatment at the East Tennessee Spine and Orthopedic Specialists for low back pain, which he said was slowly getting worse. He rated the pain a six out of ten on a scale of one to ten. Oaten was x rayed and assessed to have degenerative disc disease. He returned on August 2, 2013, for a followup appointment and reported that his low back pain was a six out of ten and reported left thigh and bilateral foot pain. He was assessed to have multilevel degenerative disc disease in lumbar spine and left lower extremity radiculitis. Oaten testified that he understood that he had degeneration in his cervical spine as well. He reported similar symptoms on September 23, 2013, and he was treated with a steroid injection and back brace by Dr. Nicholas Grimaldi. On October 28, 2013, Oaten reported a 50 percent improvement due to the epidural injection but still rated his low back pain as a five out of ten. He said that the pain was not caused by any accident or fall.

Records from the East Tennessee Spine and Orthopedic Specialists show that Oaten suffered a fall on March 14, 2014, which resulted in greatly worsened back pain. At an appointment on March 20, 2014, he reported that his back pain rated an eight out of ten and seemed to be getting

worse. The records indicate that Grimaldi x rayed Oaten and compared the images with x rays performed in January 2012, finding increased disc degeneration. He was prescribed hydrocodone at that time. He was also referred to a pain management program in 2014 due to his back pain, but he did not attend. Oaten testified that he did not remember having any issues with his walking gait in 2014.

Oaten saw Grimaldi on October 3, 2014, due to neck pain and upper extremity numbness. He was again assessed with degenerative disc disease and additionally assessed as having bilateral upper extremity radiculitis. Two weeks later, Oaten returned and reported that his neck and upper extremity pain had improved, but he reported having persistent back pain. He rated his pain as a three out of ten. On February 13, 2015, Oaten saw Grimaldi due to right knee pain, and Grimaldi prescribed a different anti-inflammatory drug and discussed possible steroid or lubricating injections in the future.

Through an application signed and dated by his primary care physician, Dr. Dennis Duck, on November 7, 2014, Oaten obtained a handicapped parking permit because walking aggravated his back pain. Before the injury, Oaten had also been prescribed a back brace, which he kept in his truck and would use while driving. In October 2014, Oaten missed approximately three and a half weeks of work while undergoing physical therapy for his neck. Oaten reported that his back pain extended down his legs prior to his workplace injury, and he received nerve blocking injections, which did not ease his pain.

On March 7, 2015, Oaten drove his Crete Carrier truck to another company to make a routine delivery. He said that the whole area there was covered with sheets of ice and snow as it had snowed a day or two before. When he exited his truck to deliver some paperwork, Oaten slipped on ice and landed on his right ankle with his foot underneath him. As he described it, "the sole of [his] foot was sticking up to the clouds," which caused him "extreme pain." He called out for help and eventually called an ambulance for himself, which transported him to the local hospital. He also spoke to his dispatcher and someone from Crete Carrier's safety department.

At the emergency department, Oaten was x rayed and diagnosed with a spiral fracture of the distal fibula. The treating emergency physician's plan of care was for him to use a boot and crutches for the time being. Oaten was discharged from the emergency department later on March 7, and his discharge instructions were to follow up with an orthopedic specialist. Oaten testified that he noticed his back pain worsened during the evening after he returned from the emergency department and then for a period of time thereafter. On March 11, 2015, Oaten returned to East Tennessee Spine and Orthopedic Specialists where he was x rayed and his work status was set as limited duty. The physician confirmed his diagnosis of a right distal fibula fracture.

After the injury on March 7, 2015, Oaten reported low back pain to Duck, who referred him to neurosurgery. His prescription for hydrocodone was also refilled, a prescription that originated when he complained of low back pain in March 2014. Oaten's physician also prescribed a pain patch, which he did not purchase due to the cost. Oaten also began using a cane after the injury, which he had first used when he had knee replacement surgery in 2013. Oaten saw a neurosurgeon who recommended back surgery, but Oaten declined due to its cost and concerns about whether it would resolve his pain. He testified that he wanted to avoid having surgery for as long as possible.

On April 28, 2016, Dr. William Hovis completed an independent medical examination of Oaten. Hovis noted that Oaten walked with "an antalgic gait right." Hovis wrote that Oaten had "severe to extreme preexisting comorbidities which directly impact, and impacted [his] response to the conservative treatment of his right ankle." Hovis determined that the combination of Oaten's preexisting conditions and his workplace injury resulted in a progressive deterioration of his right foot and ankle. He further determined that surgery may be required to treat Oaten's ankle and foot problems. Hovis concluded that Oaten had not reached maximum medical improvement. He stated that Oaten should not engage in any work requiring climbing, squatting, or kneeling. Hovis also plainly stated, "[Oaten] should not engage in commercial driving (i.e., tractor trailer, etc.)."

Oaten had surgery on his foot/ankle on August 4, 2016, which was performed by Dr. Jeffrey Dikis. Dikis' records showed that Oaten had "exhausted all conservative therapy" after his ankle injury was originally treated non-operatively. During the approximately year and a half between Oaten's workplace injury and surgery, he had developed posttraumatic ankle arthritis and syndesmotic diastasis. On August 12, Oaten returned for a post-operative follow-up appointment, and Dikis' records show that he was "[d]oing well." Dikis placed him on limited duty, restricting him to a sitting job with his leg elevated. He also wrote "No use" next to the form's heading "Lower Extremity." Dikis opined in a report dated December 27, 2016, that Oaten had a 17 percent impairment to the right foot.

On April 12, 2017, Oaten's back pain had increased such that he was treated with extended release morphine. He discontinued the morphine's use because he said it did not help with his pain. When Dikis later released him on July 25, 2017, he prescribed limited work duty, which required a sitting job with his foot elevated. Dikis indicated that Oaten could walk short distances. Oaten testified that his work at Crete Carrier required him to walk longer distances than when he was at home.

Oaten testified that his back pain, on a scale of one to ten, was usually at an eight or nine without pain medicine and a seven or eight with pain medicine but added that "it was nowhere like that . . . before that accident" on March 7, 2015. Oaten described having pain shoot down into his right leg "like a jolt of lightning" approximately two to three times per week. He said that his back pain prevented him from completing household chores such as cleaning toilets, vacuuming, or sweeping and limited his activity to primarily sitting in a chair. Oaten testified that he was able to complete household chores prior to suffering his workplace ankle injury. He said that he has walked differently since the injury, describing it as off-balanced and pigeon-toed. Oaten recalled an occasion when he felt a shooting pain in his ankle before it gave out and he fell to the ground.

Oaten testified that he nevertheless has hooked up his 20-foot camper to his truck and gone camping approximately twice since his injury. He said that he has also driven from Tennessee to California in his pickup and then taken a cruise from California to Hawaii. Additionally, he took a cruise to Panama in February 2017.

Duck prepared a report dated August 7, 2017. He stated that Oaten had been a patient in his clinic since 2013 and suffered from osteoarthritis, gout, and degenerative disc disease for many years. Duck opined that Oaten suffered from progressive pain following the workplace injury on March 7, 2015, which had "worsened to the extent that he is now unable to maintain gainful employment."

In his deposition, Duck again noted Oaten's existing back issue--"a significant deformity of his back"--which he said was "exacerbated" by his workplace slip and fall. Duck said that his medical opinion of Oaten's condition was based on his own physical examination of Oaten and a review of records from consulting specialists who cared for him, including Grimaldi. However, Duck acknowledged that he had not had in-person verbal discussions with those specialists but instead relied on their notes and records. With respect to Grimaldi's records in particular, Duck said that he only had access to records concerning treatment after the workplace injury. Duck was asked directly whether reviewing Grimaldi's other records could have changed his conclusion, and Duck said they would have had no effect, regardless of what they showed. He reiterated that his conclusion was based on years of treating and examining Oaten both before and after his workplace injury.

Duck discussed his endorsement of Oaten's application for disabled person license plate on November 17, 2014. While the application only lists degenerative disc disease in the "nature of the disability" blank on the form, Duck testified that he could have listed a number of conditions that ailed Oaten. Duck checked the box on the form that indicated Oaten's disability was permanent not temporary. He stated during his deposition that he felt that Oaten could not walk more than 200 feet without difficulty or having to stop.

Dr. Thomas Koenig also drafted an independent medical evaluation, which was dated October 25, 2017. Koenig later corrected his evaluation, primarily for better readability but also with regard to his impairment rating of Oaten's ankle. Koenig completed a physical examination and noted Oaten's antalgic gait, specifically that he used a cane and dragged his right foot.

In his diagnoses, Koenig attributed "[p]ossible symptom magnification of the lumbar condition" to Oaten's workplace injury. He noted degenerative disc disease of the lumbar spine as an orthopedic diagnosis not attributable to the workplace injury. Based on his diagnoses, Koenig calculated that Oaten suffered a 13 percent impairment of the lower extremity, which he reduced to 11 percent to account for the preexisting apportioned deficit of osteoarthritis. He calculated that Oaten's 11 percent impairment of the lower extremity correlated with a 4 percent impairment of the whole person attributed to the workplace injury. However, regarding Oaten's lumbar spine, Koenig determined that he "had no permanent aggravation from any potential additional altered gait, especially as [he] was noted to have had an altered gait prior to the workmen's comp injury of 7 March 2015." Accordingly, Koenig assigned a 0 percent impairment rating as it pertained to the lumbar spine. Koenig concluded with certainty that there were no anatomic changes to Oaten's spine as a result of the workplace injury and no permanent aggravation of the preexisting lumbar condition. He noted that any progression of Oaten's low back issues could be accounted for by the natural progression of his preexisting condition and prior documented gait abnormalities.

Dr. William Kennedy drafted an independent medical examination dated February 22, 2018. Kennedy interviewed and physically examined Oaten and reviewed myriad medical records, including those from Grimaldi. Kennedy noted that Oaten suffered low back pain prior to the workplace injury, which became much more intense and constant afterward, persisting through the time of his examination. He also noted that Oaten's back pain radiated into his lower extremities constantly after the injury. Kennedy further noted that even though Oaten wears an Arizona Brace on his right foot and ankle and uses a walking cane, his right ankle "still tends to give way."

Kennedy wrote, "Sitting as long as about 30 minutes regularly increases his low back pain. . . . His limitations in sitting continue to interfere with his ability to travel."

Kennedy reviewed MRI studies of Oaten's lumbar spine from April 2012 and February 2018. He noted that the 2012 study showed advanced degenerative changes including severe foraminal stenosis and lateral stenosis at the L3 and L4 levels. He then noted that a side by side comparison of the two studies did not reveal any significant further change had occurred between 2012 and 2018. Kennedy diagnosed Oaten as having multiple level advanced degenerative disc disease at each level of the lumbar spine.

Kennedy concluded to a reasonable medical certainty that Oaten's workplace slip and fall permanently aggravated and advanced his preexisting underlying multiple level degenerative disc disease of the lumbar spine, which permanently worsened that condition. He noted that the workplace injury converted Oaten's intermittent low back and lower extremity pain from intermittent to constant and also increased the pain's severity. Kennedy opined that Oaten's lumbar spine and right lower extremity conditions had stabilized by the time of his examination consistent with the definition of maximum medical improvement. Kennedy also noted that Oaten walked with an altered gait, which was consistent with his foot and ankle injury. He opined that Oaten's "gait alteration can be expected to increase his back pain based on the objective findings in his lumbar spine."

Kennedy calculated that Oaten suffered 9 percent permanent physical impairment to the whole person as a result of the injury he suffered to his lumbar spine attributable to the slip and fall of March 7, 2015, and a 23 percent permanent physical impairment to the right foot. He determined that any employment Oaten obtained should allow him to sit at least 75 percent of the time and change position at least every 30 minutes. Kennedy also stated that Oaten should not attempt any bending, stooping, squatting, or climbing.

On April 12, 2018, Grimaldi authored a report stating that he could not say with a reasonable degree of medical certainty that symptoms in Oaten's spine were aggravated or accelerated by the workplace injury. He noted that Oaten had a "significant history" of preexisting degenerative disc disease, which "seemed consistent" before and after his workplace injury. Accordingly, Grimaldi determined that he could not assign any work restrictions arising out of lumbar spine complaints for that date of injury.

On May 3, 2019, the compensation court entered its order awarding benefits to Oaten. The court exhaustively recounted the evidence it considered. With respect to Oaten's injury to his right foot and ankle, it noted that Dikis found Oaten had a 17-percent impairment of the right foot, Koenig found him to have a 13-percent impairment of the right lower extremity, and Kennedy found him to have a 23-percent impairment to the right foot. The court found that Oaten had a 17-percent impairment or loss of use to the right foot, which entitled him to 25.5 weeks of permanent benefits.

The court then evaluated Oaten's low back injury, noting that he suffered from a preexisting condition. To determine whether Oaten's low back condition was aggravated or accelerated by the workplace injury, the court examined medical records and summarized Oaten's history of low back pain and treatment thereof both before and after the workplace injury. The court noted in particular that both Duck and Kennedy examined Oaten and opined that his

workplace injury permanently aggravated his low back condition. Koenig and Grimaldi determined, however, that Oaten's workplace injury was not to blame for his worsened low back condition. After weighing the competing opinions, the court found that Oaten's workplace injury on March 7, 2015, did result in an increase in back pain and as a result aggravated or accelerated his preexisting back condition.

The court concluded that Oaten was permanently totally disabled. The court found that his average weekly wage on March 7, 2015, was $956.71, which entitled him to temporary and permanent benefits of $637.83 per week, and it ordered Crete Carrier to pay benefits accordingly.

A hearing was held on May 28, 2019, to determine Crete Carrier's liability for medical expenses. Exhibit 81 was admitted into evidence, and the court directed Crete Carrier to pay certain medical expenses related to Oaten's workplace injury.

Crete Carrier now appeals.

## ASSIGNMENTS OF ERROR

Crete Carrier assigns that the compensation court erred in finding that Oaten's back condition was a compensable consequence of his workplace injury and in calculating his loss of earning capacity.

## STANDARD OF REVIEW

Pursuant to Neb. Rev. Stat. § 48-185 (Cum. Supp. 2018), a judgment, order, or award of the compensation court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the judgment, order, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Martinez v. CMR Constr. & Roofing of Texas*, 302 Neb. 618, 924 N.W.2d 326 (2019). An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law. *Id*. Findings of fact made by the compensation court after review have the same force and effect as a jury verdict and will not be set aside unless clearly erroneous. *Id*.

## ANALYSIS

*Aggravation of Preexisting Condition.*

Crete Carrier argues that there was insufficient medical evidence demonstrating that Oaten's worsened back condition was due to the workplace injury and not the progression of his preexisting condition. Crete Carrier argues specifically that the opinions of Duck and Kennedy were fundamentally flawed and should not have been relied on by the compensation court. Oaten argues that the court's findings were based on sufficient evidence, including Duck's and Kennedy's opinions. We find no clear error in the compensation court's finding that Oaten's workplace injury exacerbated his preexisting condition so as to render him totally disabled.

Under Neb. Rev. Stat. § 48-121 (Reissue 2010), a workers' compensation claimant may receive permanent or temporary workers' compensation benefits for either partial or total disability. "Temporary" and "permanent" refer to the duration of disability, while "total" and

"partial" refer to the degree or extent of the diminished employability or loss of earning capacity. *Gardner v. International Paper Destr. & Recycl.*, 291 Neb. 415, 865 N.W.2d 371 (2015). Temporary disability is the period during which the employee is submitting to treatment, is convalescing, is suffering from the injury, and is unable to work because of the accident. *Escobar v. JBS USA*, 25 Neb. App. 527, 909 N.W.2d 373 (2018). Temporary disability benefits under the Nebraska Workers' Compensation Act are discontinued at the point of maximum medical improvement because a disability cannot be both temporary and permanent at the same time. *Krause v. Five Star Quality Care*, 301 Neb. 612, 919 N.W.2d 514 (2018).

When an injured employee has reached maximum medical improvement, any remaining disability is, as a matter of law, "permanent," within the meaning of the Nebraska Workers' Compensation Act. *Krause v. Five Star Quality Care, supra*. Total disability exists when an injured employee is unable to earn wages in either the same or a similar kind of work he or she was trained or accustomed to perform or in any other kind of work which a person of the employee's mentality and attainments could perform. *Escobar v. JBS USA, supra*. Total and permanent disability does not mean a state of absolute helplessness, however. *Gardner v. International Paper Destr. & Recycl., supra*. It means that because of an injury (1) a worker cannot earn wages in the same kind of work, or work of a similar nature, that he or she was trained for or accustomed to perform or (2) the worker cannot earn wages for work for any other kind of work which a person of his or her mentality and attainments could do. *Id*.

Whether a plaintiff in a Nebraska workers' compensation case is totally disabled is a question of fact. *Tchikobava v. Albatross Express*, 293 Neb. 223, 876 N.W.2d 610 (2016). In testing the sufficiency of the evidence to support the findings of fact in a workers' compensation case, every controverted fact must be resolved in favor of the successful party, and the successful party will have the benefit of every inference that is reasonably deducible from the evidence. *Id*. Moreover, as the trier of fact, the compensation court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Id*.

With respect to preexisting conditions, a claimant is entitled to an award under the Nebraska Workers' Compensation Act for a work-related injury and disability if the claimant shows, by a preponderance of the evidence, that the claimant sustained an injury and disability proximately caused by an accident which arose out of and in the course of the claimant's employment, even though a preexisting disability or condition has combined with the present work-related injury to produce the disability for which the claimant seeks an award. *Gardner v. International Paper Destruction & Recycling, supra*. A claimant can recover benefits when an injury, arising out of and in the course of employment, combines with a preexisting condition to produce a disability. *Id.*

In the present case, Oaten described being physically limited after the workplace injury in such a way that he could no longer perform his duties as a truck driver for Crete Carrier. One of the things Oaten was required to do while employed by Crete Carrier was to inspect his truck each morning, which necessitated him stooping and bending down and climbing underneath his truck to check the tires and lug nuts. Oaten described that he had to "climb" up into the cab of his truck. Multiple physicians testified that Oaten should not engage in the physical actions required of him as a truck driver for Crete Carrier. Kennedy specifically stated that Oaten should not engage in

bending, stooping, squatting, or climbing. Hovis echoed Kennedy's statement and specifically stated, "[Oaten] should not engage in commercial driving (i.e., tractor trailer, etc.)." Duck opined that Oaten's permanent injury prevented him from engaging in any gainful employment.

Oaten testified that, after suffering the workplace injury, he could not even complete household chores due to the pain he experienced when engaged in those kinds of movements. He testified that he was essentially confined to sitting in a chair. Kennedy noted that, even with a brace, Oaten's ankle occasionally gave out and that prolonged periods of sitting aggravated his back. Despite Oaten's condition, Kennedy opined that he had achieved maximum medical improvement. Both Kennedy and Duck opined that Oaten's limitations were the result of his ankle injury which led to an exacerbation of the pain he experienced in his back due to his prior condition.

Conflicting evidence does exist in the record. Namely, Grimaldi and Koenig determined that Oaten's preexisting condition had not been worsened by his workplace injury. Additionally, Oaten testified that he was still able to drive, traveling from Tennessee to California and had twice hooked his pickup truck to his 20-foot camper and gone camping since being injured on the job.

The compensation court examined all the evidence, weighed it, assessed its credibility, and determined that Oaten was permanently totally disabled. In making that determination, the court more favorably considered the assessments of Duck, Kennedy, and Hovis. We do not engage in a reweighing of that evidence on appeal. Where the record contains evidence to substantiate the factual conclusions reached by the trial judge of the compensation court, an appellate court is precluded from substituting its view of the facts for that of the compensation court. *Eddy v. Builders Supply Co.*, 304 Neb. 804, 937 N.W.2d 198 (2020). The record contains evidence substantiating the court's conclusion that Oaten's workplace injury on March 7, 2015, when combined with his preexisting condition caused him to become permanently totally disabled, and thus, we affirm that conclusion.

*Loss of Earning Capacity.*

Crete Carrier contends that the compensation court erred by failing to apply requisite factors in determining Oaten's loss of earning capacity. Crete Carrier argues that such a failing renders the court's award devoid of any basis for meaningful appellate review. Oaten responds by arguing that the court considered the requisite factors in determining his loss of earning capacity.

A worker who, solely because of his or her injury, is unable to perform substantial amounts of labor, either in his or her particular line of work, or in any other for which he or she would be fitted except for the injury, is totally disabled within the meaning of the workers' compensation law. *Martinez v. CMR Constr. & Roofing of Texas*, 302 Neb. 618, 924 N.W.2d 326 (2019). For permanent partial disability purposes, injuries to the body as a whole are compensated based upon a loss of earning capacity. *Id.*

As the Nebraska Supreme Court held in *Sidel v. Travelers Ins. Co.*, 205 Neb. 541, 288 N.W.2d 482 (1980), when determining a loss of earning capacity for an injured worker, the four factors to consider under § 48-121 are the worker's (1) eligibility to procure employment generally, (2) ability to earn wages, (3) ability to hold a job obtained, and (4) capacity to perform the work in the job in which the worker is engaged. *Martinez v. CMR Constr. & Roofing of Texas, supra*. A

determination as to whether an injured employee is able to perform the work for which that employee was previously trained is a question of fact to be determined by the compensation court, and that determination will not be disturbed by an appellate court unless the finding is clearly erroneous. *Haney v. Aaron Ferer & Sons*, 3 Neb. App. 14, 521 N.W.2d 77 (1994). Workers' Comp. Ct. R. of Proc. 11A (2011) specifies that decisions of the compensation court shall provide the basis for a meaningful appellate review and that the judge shall specify the evidence upon which the judge relies. It would have been preferable for the compensation court to have conducted a straightforward and explicit analysis of the *Sidel* factors, thereby making a clear record of its analysis of Oaten's loss of earning capacity. However, imbedded in the court's analysis of Oaten's injuries, the court nevertheless did make findings with respect to his ability to work.

The court's order makes it clear that that Oaten's workplace injury on March 7, 2015, rendered him incapable of engaging in the work he previously performed. As a truck driver, Oaten needed full use of his right foot. He was also required to climb, stoop, and bend. The court recited reports from Oaten's physicians who restricted him to a sitting job that allowed him to elevate his right leg and walk around often because sitting for prolonged periods worsened his low back pain. The court highlighted that Oaten wore a brace on his right ankle, not wearing a shoe on his affected foot, and walked with an antalgic gait, dragging his right foot and being assisted by a cane. Oaten, therefore, lacked the capacity to work as a truck driver on account of the workplace injury that he suffered. Ultimately, the court adopted the opinion of Kennedy, finding that the ankle injury had increased Oaten's back pain. The court stated: "Kennedy notes in his report that the gait alteration can be expected to increase his back pain based on the objective findings in his lumbar spine. In other words, the altered gait that [Oaten] has due to the slip and fall has accelerated [Oaten's] pain and disability of the previous injury, and he is now unable to work." The compensation court then found that Oaten was permanently totally disabled.

We note that, although not cited by the compensation court, its ultimate findings are supported by the report of Helen Long, the court appointed vocational rehabilitation counselor who conducted a loss of earning capacity analysis. Her report, which was received at trial, notes the findings of the various doctors who treated or examined Oaten. Long notes that Kennedy assigned a permanent impairment rating to the body as a whole and imposed permanent work restrictions including sedentary work that would allow Oaten to change postures at least every 30 minutes. She concluded: "If the opinion of Dr. Kennedy is adopted as the prevailing medical opinion, it is this vocational counselor's opinion that Michael Oaten has experienced a loss of earning power of 100% as the result of his March 7, 2015 work injury."

The compensation court's order is clear that it did adopt Kennedy's opinion. As such, the record supports its finding that Oaten is permanently totally disabled and has experienced a total loss of earning capacity. While we would have preferred the compensation court to more explicitly spell out its findings in its order, we nonetheless find that the record and the order are sufficiently clear for us to carry out a meaningful review. We find that the compensation court's finding is not clearly erroneous. Therefore, we affirm.

CONCLUSION

Based on the foregoing, we affirm the compensation court's findings and award of benefits to Oaten based on the workplace injury he suffered while employed by Crete Carrier.

AFFIRMED.